In re MID-VALLEY COAL CO.

CAMPBELL v. SPRUKS et al.

(Circuit Court of Appeals, Third Circuit. July 11, 1918.)

No. 2331.

BANKRUPTCY ⟨⟩288(1)—ADVERSE CLAIM TO PROPERTY—SUMMARY PROTECTION OF TRUSTEE.

Where, after the respective rights of a trustee and adverse claimants as to property had fully matured, a watchman placed in charge by the trustee peaceably withdrew, on receiving notice that a person employed by adverse claimants was to take his place, neither force nor threats being used, the trustee had no such possession as called for summary protection by the bankruptcy court.

Appeal from and Petition for Revision of Proceedings of the District Court of the United States for the Middle District of Pennsylvania; Chas. B. Witmer, Judge.

In the matter of the Mid-Valley Coal Company, bankrupt. Petition by George M. Campbell, trustee, for summary protection as to property claimed by him as against David R. Spruks and others, adverse claimants thereof. The petition was dismissed, and the trustee appeals and files a petition to revise. Order modified and affirmed on the petition to revise, and the appeal dismissed.

Lee P. Stark and Knapp, O'Malley, Hill & Harris, all of Scranton, Pa., for appellant.

Cornelius Comegys and Charles B. Little, both of Scranton, Pa., for appellees.

Before BUFFINGTON, McPHERSON, and WOOLLEY, Circuit Judges.

McPHERSON, Circuit Judge. The trustee of the Mid-Valley Coal Company has brought this controversy before us both by appeal and by petition to revise. The respondents are the Bright Coal Company, its superintendent, and the Lillibridge heirs, adverse claimants to the possession of a mining property in Lackawanna county. The bankrupt had been mining under a lease from the Lillibridge heirs, and was adjudged bankrupt on August 1, 1916. On October 27 George N. Campbell was elected trustee, and the next day he filed a bond of $1,000 and put a watchman on the premises. Early in December the place of this man was taken by a watchman in the employ of the respondents and on December 11 Campbell asked the District Court for relief, asserting that by this act his possession as trustee had been interfered with. On the same day the court's restraining order directed the respondents to surrender possession forthwith, and enjoined all persons from interfering with the trustee's possession and management, granting a rule to show cause on December 18 why the order should not be continued. To this rule the Lillibridge heirs set up the claim that before October 28 they had regained their right to possession, and had afterward leased the vein to the Bright Coal Company, which was now the tenant and

⟨⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

was producing coal. Thereupon the court appointed a master to take testimony and report the facts and his recommendations thereon. This was done, and on February 2, 1917, the master recommended the dismissal of the trustee's petition. On February 5 the court ordered that the Bright Coal Company might continue mining unless within ten days the trustee should indemnify the company against damages caused by the restraining order; directing the company to keep an account of coal produced while the petition was undisposed of. The bond was not given and the company continued to mine. Not long afterward the court considered the report, and on June 26 affirmed it and dismissed the petition, this being the order that is now before us. The dispute belongs to a class that is ordinarily tried out in a plenary action; it presents several questions of fact that are usually for a jury, and from the first the respondents have set up their right to such a hearing, denying the authority of the bankruptcy court to decide the case summarily. In order to make the situation plain, a further statement of the facts is desirable:

In December, 1914, the Mid-Valley Coal Company became the assignee of the lease in question by which the Lillibridge heirs conveyed all the coal in the vein and agreed to a term without limit for its removal. No minimum royalty was fixed, but the company was to pay for such coal only as should be taken out. It agreed, however, to mine energetically and to prosecute the operation in a fair and workmanlike manner. Failure to mine as agreed upon or to pay the royalty might be followed by forfeiture of the lease. The company promptly erected a breaker and otherwise equipped the mine, but for reasons that perhaps do not fully appear its life as a producer was short. It is clear, however, that one reason was insufficient resources; it was in financial trouble from the start, and after a year's experiment it ceased to mine, the royalty for January, 1916, being the last that was paid. The following paragraphs from the master's findings accurately describe the situation after that time:

"After the Mid-Valley Coal Company had ceased its mining operations in February, 1916, it kept only a small force of employés on the premises, who were engaged in repair work. On or before the 18th of May, 1916, practically all of the mining tools and implements, blacksmith tools and other mining instruments had been removed from the leased premises, as likewise all the mine mules. And at this time all the employés had ceased working. From that date no representative of the Mid-Valley Coal Company had been on the premises for the purpose of carrying on any mining operations thereon. * * *

"At the time the Mid-Valley Coal Company ceased its mining operations in February, 1916, it was in financial difficulties, and shortly thereafter decided to make no further attempt to continue the operation; but its officers were negotiating and endeavoring to sell their stock holdings to prospective purchasers. * * *

"During the period from May 18, 1916, until October 28, 1916, while the property remained uncared for by the said Mid-Valley Coal Company and its representatives, great injury and damage was done to said property; water accumulated in the slope and mine workings; the mine motor became rusted and out of repair; the mining machinery was broken and removed; practically all the window panes in the breaker, office building, blacksmith shop, etc., were broken out, and the doors on said buildings destroyed and damaged; mine cars were allowed to run down the slope and pile on top of

the pump; fires on several occasions were started in the breaker by trespassers, and these fires were put out by Levi Lillibridge and workmen employed by him. * * *

"In July, 1916, an execution having been issued out of court of common pleas of Lackawanna county against the said Mid-Valley Coal Company, and the sheriff having made a levy thereon upon this property, an involuntary petition in bankruptcy was filed against the said Mid-Valley Coal Company and a receiver was duly appointed. Said receiver went on the property some time in the month of July, 1916, looked over the property, but took no actual possession thereof. From the date of said receiver's appointment in July until the 28th of October, 1916, no one representing the Mid-Valley Coal Company or said bankruptcy estate had anything to do with said property. On this latter date a watchman appointed by said trustee went on the property. * * *"

This was the condition of things on July 11, when the petition in bankruptcy was filed, and we think it apparent that the company was not then in actual possession. And it is at least open to doubt whether it still retained the constructive possession that ordinarily follows a legal title, the reason for the doubt being the following facts: On December 10, 1915, the company had borrowed $5,000 from John W. Peale, and to secure the loan had mortgaged, and had also assigned, the leasehold. If the company should default in performing certain covenants, the debt was to become due at once, and accordingly, on May 23, 1916, Peale, asserting the company's default and his right to dispose of the collateral security, sold the lease at broker's board and became the purchaser, taking a conveyance from the formal bidder at the sale.

We do not determine the conflicting rights of the parties under the facts thus far outlined. The company may or may not have abandoned the lease, but it certainly had given up the actual possession of the premises, and its constructive possession was at least assailed by the apparent title that Peale had acquired. Therefore, when a receiver was appointed early in July, he had practically nothing to do. He visited the mine once, and had an appraisement made; but he made no effort to dispose of whatever the company may still have owned upon the premises, and he took no step toward caring for the property or going on with the operation. And there is another matter also to be considered, namely, what the lessors did in the effort to forfeit the lease for nonperformance of the company's covenants. As no mining had been done since January, and as (prima facie at least) there were other grounds of forfeiture, the lessors undertook to exercise their reserved right, and on September 14 notified Peale (who was then the holder of the paper title) that a forfeiture had been declared; and about November 14, after Campbell had been elected trustee, notified him also to the same effect. Assuming that a cause for forfeiture existed, no one attempted to remove it. In December, the lessors, asserting that they had regained possession either in consequence of the company's retirement or abandonment, or of their own proceeding to forfeit, leased the premises to the Bright Coal Company, and this company went into possession and is now producing coal and paying royalty.

The single question for decision is whether the trustee had such possession as called for summary protection by the bankruptcy court. Unless he had, the court was right in declining jurisdiction. There was

251 F.—52

no forcible ouster; the trustee's watchman, having received notice that another person was to take his place, withdrew at once and peaceably, neither force nor threat being used; and, as the change of watchmen did not occur until December, the respective rights of both parties had by that time fully matured, and it is clear that both were asserting rights that they believed to be valid. Indeed, neither disputes the good faith of the other.

Under these circumstances we are not disposed to interfere with the order of dismissal. If the learned judge had seen reason to suppose that his process or his officer had been disregarded, he would certainly have vindicated his own authority, and would have compelled the restoration of the status quo. His means of knowing the true situation was so much better than our own that we are reluctant to run counter to his decision, especially since he and the master agree upon the facts. We repeat that the only question is whether the trustee had received from the bankrupt, or had acquired, so plain a right to the actual and exclusive possession of the property that the court was bound to require all adverse claimants to come before it to assert their claims. We admit that we have reached this conclusion after some hesitation, but in favor of the right of trial by jury we have finally decided that this controversy should be settled in a plenary suit. Murphy v. Hofman Co., 211 U. S. 562, 29 Sup. Ct. 154, 53 L. Ed. 327; In re Rathman (C. C. A. 8) 183 Fed. 913, 106 C. C. A. 253, 25 Am. Bankr. Rep. 262. The trustee seems to have succeeded to little from the bankrupt, and to have acquired but a shadow for himself. At all events, the foundation for summary jurisdiction is too insubstantial.

Perhaps the order under review—which dismisses the trustee's petition "without prejudice"—may sufficiently protect his rights, in case he should proceed in some other court; but we are inclined to believe that future discussion may be avoided by having the order state definitely the ground on which it rests. And this is especially desirable, because the learned judge contented himself with affirming "the material and important findings and conclusions" of the master, without pointing out the findings and conclusions he had in mind. The ground of dismissal was probably lack of jurisdiction, but the order should be so modified as to state this ground distinctly, thus making it clear that nothing else is now decided, and that all other questions, either of abandonment, or of forfeiture, or of irregular sale under the Peale mortgage, are open to future inquiry.

We direct the order to be thus modified, and in that form we affirm it on the petition to revise. The appeal is dismissed.